# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES SAUER<br>90 Long Duck Pond Road<br>Plymouth, Massachusetts 02360,<br><br>PETER MARTINO<br>67 Oak Ridge Drive<br>Epsom, New Hampshire 03234,<br><br>          Plaintiffs,<br><br>    v.<br><br>ARMORGROUP NORTH AMERICA, INC.<br>1420 Spring Hill Road<br>McLean, Virginia 22102,<br><br>      Serve:<br>      CORPORATION SERVICE COMPANY<br>      11 S 12th Street<br>      Richmond, VA 23218<br><br>and<br><br>ARMORGROUP INT'L, PLC<br>Egginton House<br>25 – 28 Buckingham Gate<br>London, United Kingdom<br>SW1E 6LD,<br><br>      Serve:<br>      CORPORATION SERVICE COMPANY<br>      2711 Centerville Road<br>      Suite 400<br>      Wilmington, DE 19808<br><br>and<br><br>KARL SEMANCIK<br>1117 Grand Rapids Drive<br>Herndon, Virginia 20170,<br><br>and | Civil Action No. _____ |

|  |  |
|---|---|
| MICHAEL O'CONNELL | ) |
| 1420 Spring Hill Road | ) |
| McLean, Virginia 22102, | ) |
|  | ) |
| and | ) |
|  | ) |
| CAROL RUART | ) |
| Egginton House | ) |
| 25 – 28 Buckingham Gate | ) |
| London, United Kingdom | ) |
| SW1E 6LD, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement and Introduction

1.  This is a civil action for declaratory, injunctive and monetary relief for injuries Plaintiffs James Sauer and Peter Martino sustained as a result of their unlawful terminations, in retaliation for their whistleblowing about the fraudulent representations made by Defendants ArmorGroup North America ("AGNA") and ArmorGroup International ("AGI"); Defendant Karl Semancik, former President of AGNA; Defendant Michael O'Connell, former Director of Operations of AGNA; and Defendant Caroline Ruart, former Director of Human Resources of AGI (collectively Defendants) to the United States Department of State. Defendants made these fraudulent misrepresentations regarding AGNA's experience, staffing capabilities, equipment and facilities in its attempt to secure and maintain a $187 million government contract to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan. Plaintiffs bring their claims for retaliatory and wrongful discharge under the anti-retaliation provision of the False Claims Act,

31 U.S.C. § 3730(h), and the common law claim of wrongful discharge in violation of public policy.

2.    Plaintiffs, who gave lengthy and distinguished service in the United States Marine Corps and command records of success in the management of security functions in combat and other crisis situations, were employed by Defendant AGNA during 2007 as the chief Program Managers responsible for providing a guard force to protect the U.S. Embassy in Kabul, Afghanistan pursuant to a contract awarded to AGNA by the United States Department of State ("DoS").  Soon after beginning their employment, Plaintiffs discovered that Defendants had materially misrepresented AGNA's capabilities in winning the contract award and lacked the means, facilities, and expertise to perform as warranted.  Plaintiffs repeatedly reported their concerns to Defendants, who acknowledged that AGNA had underbid the contract in order to secure it, and who directed them to "make do" and put a "good face" on the situation to ensure that a profit would be made on the contract and that shareholders would be satisfied.  Defendants also ignored concerns that the DoS could pull the contract if AGNA failed to comply with its terms, blithely noting that DoS contracting officers understood, post-Blackwater, that their fates were tied to ArmorGroup's, thus making them reluctant to take adverse action against AGNA.

3.    After strongly objecting to the business practices of AGI and AGNA (hereinafter collectively referred to as "ArmorGroup Defendants") of putting profit over the security standards necessary to protect the U.S. Embassy and its personnel, Plaintiffs were terminated from their employment on June 13, 2007, the day after conveying their concerns to Defendant O'Connell, and thereafter to responsible personnel at the U.S. Embassy, including via a writing that detailed the numerous ways in which AGNA "has no regard for the security of the United States Embassy, and is interested in only their stocks."

4.    This is also an action against the ArmorGroup Defendants, and Defendants Semancik and O'Connell, for the tort of fraudulent misrepresentation.  These Defendants made material misrepresentations to Plaintiffs that they knew to be false, with the intent to deceive Plaintiffs into accepting program management positions with AGNA, and upon which Plaintiffs relied to their detriment.

5.    This is also an action against Defendants for false imprisonment, stemming from actions taken by Defendants to effectuate Plaintiffs' unlawful terminations.  Plaintiffs were confined against their will and stripped of weapons and any means of communicating with the Embassy RSO or other government officials, and forced to depart Afghanistan the next day.

6.    This is also an action against Defendants for defamation.  By terminating Plaintiffs allegedly "for cause," Plaintiffs are now forced to self-publicize on employment applications and security clearance forms the false and defamatory fact that they were terminated for misconduct.

7.    This is also an action against Defendants for civil conspiracy.

8.    In the ten months since Defendant unlawfully terminated Plaintiffs' employment, Plaintiffs have been blackballed and have been unable to find substitute employment.  Their successful and promising careers in security management have been destroyed as a direct and proximate result of their vigorous pursuit of concerns about the security of the U.S. embassy in Kabul and of Defendants' unlawful actions in response to those concerns.

**Jurisdiction and Venue**

9.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as these claims arise from violations of laws of the United Sates and related state statutes. This Court also has diversity jurisdiction, pursuant to 28 U.S.C. § 1332, as the parties are

residents of different states and the amount in controversy for each claim exceeds $75,000.  This

court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §

1367.

10.  Venue is proper in this Court pursuant to 37 U.S.C. § 3732 and 28 U.S.C. § 1391.

Defendants do business in the District of Columbia.  Additionally, acts proscribed by 31 U.S.C. §

3729 occurred in the District of Columbia.  AGNA's contract with DoS was administered in the

District of Columbia and Defendants addressed false statements within the meaning of 31 U.S.C.

§ 3729 to DoS in the District of Columbia.

**Parties**

11.  Plaintiff James Sauer is a citizen of the Commonwealth of Massachusetts.  Mr.

Sauer served in the United States Marine Corps from 1971 to 2003.  During his career he served

in the reconnaissance community, infantry units, and as a battalion chief scout-sniper during

operation Desert Storm.  He retired after completing two tours as Sergeant Major of infantry

commands.  From 2003 through 2007, Mr. Sauer had a successful career as a Project Security

Manager and Consultant for various commercial and U.S. Government projects in the United

States and throughout the Middle East and Central Asia.  Mr. Sauer presently holds a top secret

security clearance.

12.  Plaintiff Peter Martino is a citizen of the State of New Hampshire.  Mr. Martino

is a Colonel in the U.S. Marine Corps Reserve who has been mobilized three times.  During his

military career, he commanded an infantry platoon, company, and battalion.  He was also the

senior U.S. adviser to an Iraqi Army brigade.  Mr. Martino has had a successful civilian career

providing training, consulting, and program management services to private companies and to

state and federal agency contractors.  Mr. Martino presently holds a top secret security clearance.

13.  Defendant ArmorGroup North America, Inc. (AGNA) is incorporated in the State of Delaware and has its headquarters at 1420 Spring Hill Road, McLean, Virginia 22102.  At various times, AGNA has been registered to do business in the District of Columbia, Arkansas, and Florida.  AGNA presently does business with one or more agencies of the United States government, which are based in Washington, D.C., and regularly transacts business in the District of Columbia.

14.  Defendant ArmorGroup International, PLC (AGI) is a corporation formed under the laws of the United Kingdom, is based in London and has its headquarters at Egginton House, 25 – 28 Buckingham Gate, London, United Kingdom, SW1E 6LD.  AGI does business with the United States government directly and through its subsidiary, AGNA.  AGI regularly transacts business in the District of Columbia.

15.  Defendant Karl Semancik resides at 1117 Grand Rapids Drive, Herndon, Virginia 20170.  At all times relevant to this Complaint, Mr. Semancik was the President of Defendant AGNA.   Mr. Semancik regularly transacted business in the District of Columbia on behalf of Defendant AGNA.

16.  Defendant Michael O'Connell is a citizen of the Commonwealth of Virginia and his business address is 1420 Spring Hill Road, McLean, Virginia 22102.  At all times relevant to this Complaint, Mr. O'Connell was Director of Operations for Defendant AGNA.  Mr. O'Connell regularly transacted business in the District of Columbia on behalf of Defendant AGNA.

17.  Defendant Carol Ruart is a citizen of the United Kingdom and her business address is Egginton House, 25 – 28 Buckingham Gate, London, United Kingdom, SW1E 6LD.  At all times relevant to this Complaint, Ms. Ruart was Director of Human Resources for

6

Defendant AGI.  Through her work on behalf of AGI and AGNA, Ms. Ruart regularly

transacted business in the District of Columbia.

18.  Pursuant to U.S. government requirements, a proxy agreement must separate

AGNA and AGI so that AGNA is operationally independent from AGI.  This proxy

arrangement allows AGNA to hold a facility security clearance for facilities owned by the

United States and ensures that foreign nationals will not direct the security operations at the

U.S. Embassy in Kabul.  A Proxy Board oversees this arrangement.

### Factual Allegations

19.  On or around April 16, 2006, the U.S. Department of State sent out a Request for

Proposal ("RFP") to provide local guard and security services to the U.S. Embassy in Kabul,

Afghanistan.  The Performance Work Statement prepared by the DoS provided that the U.S.

Mission "requires the operation and management of a highly-trained, professional security

force, hereinafter referred to as the Embassy Security Force."  The RFP described the scope of

work as follows: "The Embassy Security Force shall provide 24-hours a day deterrent against

the unauthorized, illegal, or potential life-threatening activities directed toward the Mission's

employees and subcontractors, visitors, sensitive information, and properties in and around the

U.S. Mission in Afghanistan.  These offenses include, but are not limited to, unlawful entries,

terrorist attacks, assassination attempts, theft of property and/or classified materials, and

unlawful destruction of public properties. The Contractor is required to recruit, train, and

manage the armed professional security personnel and supervisory employees utilized in this

effort."  The RFP set out in detail the mandated security requirements under this contract.

20.  In response to the RFP, Defendants, through the assistance of James D. Schmitt,

Vice President of Business Development for AGNA, submitted a bid for this government

contract, in which they knowingly made exaggerated and demonstrably false statements about AGNA's capacities, experience, staffing capabilities, equipment, personnel, and facilities to provide a guard force to protect the U.S. Embassy in Afghanistan.  Defendants' bid included material false statements about Camp Anjuman, Defendant AGI's base of operations in Afghanistan, and AGNA's infrastructure, government contacts, ISAF/NATO contacts, equipment and support personnel.  As part of their effort to secure a contract with the DoS, Defendants referenced Camp Anjuman (a.k.a. Anjuman Base) as a significant resource even though the facility was already overburdened servicing the British Embassy and a number of commercial projects.  Defendants made these misrepresentations and seriously underbid the contract with DoS to ensure that AGNA would be awarded this lucrative government contract.

       21.   In or around December 2006, AGNA recruited and hired Mr. Sauer to serve as Business Development Manager until AGNA formally secured the contract with DoS to provide guard and security services to the U.S. Embassy in Kabul.  In recruiting Plaintiff Sauer, AGNA made numerous representations to him about its experience and capabilities to meet the requirements of the DoS RFP, including, *inter alia,* that Camp Anjuman was a self-sufficient, well equipped facility that could support the Embassy project; that all training could be conducted at Anjuman; that additional help would be provided for human resources, training and acquisitions; that AGNA had personnel from AGI who were experts in Central Asia for the acquisition of goods and materials; that AGNA had a "special relationship" with various Afghan ministries needed for shipment of weapons and vehicles; that AGNA was highly selective in the personnel they would hire for this project; and that AGNA's relationship with the Gurkhas was sound.  (The word "Gurkha" is a loosely used term for the indigenous population of the middle

hills of east and west Nepal who are known for their extraordinary bravery and fighting qualities.)

22.    Based on the representations set out in paragraph 21, above, and paragraph 23, below, and assurances by Defendant Semancik that Mr. Sauer would enjoy a long career with AGNA because it was the "company of choice" and had operations all over the world, Mr. Sauer resigned from his former position and accepted the Project Manager position with AGNA at the salary of $200,000 per annum.  These misrepresentations were made throughout Plaintiff Sauer's discussions concerning employment with AGNA, and were reiterated during his trips to AGNA headquarters on December 10-14, 2006 and January 8, 2007.

23.    On or around January 8, 2007, Defendant Semancik misrepresented to Mr. Sauer AGNA's assets at Anjuman, as well as issues pertaining to Gurkha salaries, and repeated these false statements to DoS by letter dated January 24, 2007.  For example, Defendants stated that AGNA had enjoyed great success in using mixed Gurkha guard forces (Indian, Nepalese, and British Army Gurkhas), when in fact nearly 100% the Gurkhas at the Foreign Commonwealth Office walked off the job in the weeks before this response was drafted due to their pay being cut by 50% and poor treatment.  Further, AGNA stated that they had "four threat analysts at our Joint Operations Center at Anjuman Base" who had reassessed the regional threat convincing AGNA that they would need armored vehicles for transport of the guard force.  These analysts did not exist.  AGNA also falsely stated that it could "house the complete [U.S. Embassy] work force at Anjuman Base."  In fact, Anjuman was packed with personnel and could not even accommodate tents and portable toilets.

24.    In January 2007, AGNA contacted Plaintiff Martino to recruit him for the Deputy Program Manager position for the Kabul project and sought his permission to use his

9

name as Project Manager for the large project proposal it was in the process of submitting for

Iraq.   AGNA hired Mr. Martino at a rate of $185,000 per annum for an initial period of

approximately one year with an extension available with mutual consent.  AGNA made similar

representations to Mr. Martino as it did to Mr. Sauer, as set forth in paragraphs 21-23 above,

about its experience and capabilities to meet the requirements of the DoS RFP in Kabul.   Based

on these representations, Mr. Martino resigned from his former job and accepted the position

with AGNA.

25.  In or around early February 2007, Mr. Sauer deployed to Afghanistan in

preparation for AGNA's scheduled July 1, 2007 takeover of guard and security services for the

U.S. Embassy.  Almost immediately after arriving at AGI's Camp Anjuman, Mr. Sauer

determined that the facility was inadequate and that AGI was not coordinated with AGNA with

respect to personnel retention, new hiring, or administrative procedures.  For example, AGI

supported the British Embassy and a number of commercial contracts from the Anjuman facility

with mobile protection teams, lodging, and static security.  As a result, Camp Anjuman – a two-

acre base modestly comprised of a series of trailers –  and its staff were completely overtaxed as

there were insufficient personnel, vehicles, and equipment to cover their existing requirements.

Camp Anjuman had no personnel to handle the administrative and logistic functions of the U.S.

Embassy project – a project that would more than double the Camp Anjuman workload.

26.  During his first few weeks in Afghanistan, Mr. Sauer worked tirelessly to set up

operations for the takeover of guard and security services for the U.S. Embassy.  In or around

April 2007, Mr. Martino joined Mr. Sauer as the project's Deputy Director, and John Gorman

joined him as the Camp Manager.  Plaintiffs became increasingly concerned, however, about the

serious deficits of Camp Anjuman, which Defendants had materially misrepresented in order for

AGNA to win the contract from DoS. Plaintiffs repeatedly struggled to make the project work despite AGNA's lack of existing infrastructure in Afghanistan, its inability to hire and retain sufficient support personnel, its failure to provide security personnel with necessary equipment, and its lack of contacts and coordination with ISAF/NATO and the Afghan government.

27.    Commencing in March 2007 and continuing up to the time of their unlawful termination on June 13, 2007, Plaintiffs raised significant concerns, on almost a daily basis, with senior management of both AGNA and AGI via email, telephone, and in-person conversations, including concerns about AGNA's inability to provide appropriate protection for the U.S. Embassy and Embassy personnel and about Defendants' profit-over-safety culture. Plaintiffs also made disclosures to the Regional Security Officers (RSOs) of DoS about AGNA's progress in discharging its duties under the contract and, ultimately, about its inability to provide an effective U.S. Embassy Security Force.

28.    From the onset of their employment, Plaintiffs objected to Defendants' attempts to enhance AGNA's profits by significantly altering the work schedules of the guard force. Over Plaintiffs' heated objections and in contravention of the DoS RFP, which was designed around an 8-hour-day shift schedule, Defendants implemented plans requiring more hours per individual and fewer shifts of staff in order to cut costs and maximize Defendants' profit margin. By violating the maximum workable hours per week as mandated by the contract, AGNA was able to cut the needed guard force by approximately twenty percent, resulting in a substantial savings to the Company.

29.    Plaintiffs repeatedly raised concerns with Defendants that such a plan would weaken security at the U.S. Embassy. Specifically, Plaintiffs warned that by cutting a shift, AGNA would: (a) be in violation of the RFP requirement for the 54/60 maximum hours; (b)

cause fatigue and burnout leading to inattentiveness on post;  (c) lose personnel before the

transition since they would be working considerably more hours for less money; and (d) cause

severe attrition in the coming months.  Plaintiffs also protested that by cutting the workforce by

twenty percent, Defendants effectively wiped out AGNA's ability to reinforce the U.S. Embassy

in the event of an attack.

30.  Despite Plaintiffs' opposition, the ArmorGroup Defendants' managers and

executives insisted that Plaintiffs implement such workforce plans and conceal their actions from

U.,S. Embassy and other DoS personnel.  Defendant Semancik acknowledged repeatedly that

AGNA's Human Resources officer, Julie Swaggerty, was "incompetent," did not understand the

personnel requirements under the contract, and would have been fired "long ago" except that he

feared a lawsuit.

31.  By email dated March 8, 2007, Jon Knight, Regional Director for ArmorGroup

Middle East, expressly informed Defendant Semancik that Anjuman lacked the facilities or

personnel to support AGNA's contract with DoS to provide security services to the U.S.

Embassy.  Mr. Knight stated: "I raise the flag that there is little spare accommodation and/or

spare management manpower capacity to assist in transition for [United States Embassy] Kabul

that I can commit on a permanent basis as we stand this up.  I will of course – assist in every way

possible.  I am looking at developing a new build plan with [AGI in] London NOW to assist –

but in terms of warm bodies they are all committed to AG AFG operations."  He referred to his

hope of temporarily renting a UN facility 1.8 km "up the road" to facilitate the transition as his

"one ace up my sleeve."  In response to this email, Mr. Sauer, by email dated March 8, 2007,

reiterated concerns to Defendants Semancik and O'Connell, Mr. Schmitt, and Ms. Swaggerty

that "Anjuman is not as well flushed out as some of you may think." Referring to the lack of

personnel, Mr. Sauer warned that "There are no 'spares.'"

32. On or around March 10, 2007, Mr. Sauer became aware that a significant issue

existed with respect to the employment of Gurkhas, and that the DoS had visited the Foreign and

Commonwealth Office ("FCO") to raise questions about the employment of Gurkhas to guard

the U.S. Embassy in Kabul. James Cole, Project Manager for the FCO, informed Mr. Sauer that

he told the RSO that there had been problems with the Gurkhas, including a massive walkout,

resulting in replacement by Indian Army Gurkhas who did not speak English. He also reported

that there had been dissatisfaction among the FCO staff with the Indian Army Gurkhas. Mr.

Cole was fired by ArmorGroup for his candor.

33. By email dated March 11, 2007, Mr. Sauer raised concerns about AGNA's

screening and ability to hire personnel to staff up the contract. He questioned AGNA's

assumption about its ability to retain expatriates and hire the requisite number of Gurkhas,

stating: "75% retain of Expats? I don't know, the daily rate is nothing to write home about. It's

low to average for the theater." Mr. Sauer went on to note that the "Gurkha rate is nothing more

than slave labor. I'd be surprised if we keep any. The whole UK approach [with AGI] is barely

short of apartheid when dealing with these guys."

34. In response, by email dated March 11, 2007, Defendant O'Connell advised Mr.

Sauer that "the main concern" for AGNA President Semancik, which he counseled "should be

yours" too, is that Defendant AGI's "Business Development guys developed the transition

budget w/o input from you or the Ops folks" and that the budget "may be SIGNIFICANTLY

below what is required for you to stand this program up." He went on to explain that "AGNA

bid this at a very low price and a very low margin . . . which means that if we don't adhere to the

transition budget closely . . . we/you are going to take a huge hit in the profit on year one. " He stated: "I'm sure you won't give a rats (sic) if you have to take a huge hit but Karl is now the CEO and ultimately responsible for your program which means that Karl will have to take a huge hit from London and there's the rub." In ending this email, Mr. O'Connell stated, "You made an observation that 'Anjuman is not as well flushed out as some of you may think.' I would suggest that you consider that a universal law for all support you require and expect."

35. By email dated March 13, 2007, Mr. Sauer informed Defendants Semancik and O'Connell, as well as other corporate officials, about his first meeting with Regional Security Officer Martin Kraus, Deputy Regional Security Officer Edward Brennan, and Regional Security Officer Nick Pietrowicz at the U.S. Embassy that day. Mr. Sauer explained that the Regional Security Officers had made highly derogatory statements about Defendants' "questionable history" and "fell just short of accusing us of being greedy, exploitive capitalists." He further advised that they told him in "no uncertain terms" that DoS wanted to keep all the Gurkhas, if possible, and that if Defendants "could not retain the Gurkhas – not just the leadership – that they would pull the contract." Mr. Sauer further advised Defendants that the entire Gurkha guard force at the British Embassy walked off the job when their pay was cut in half and that Embassy personnel believed that "one good Gurkha is worth half a dozen stupid expats." Mr. Sauer concluded his email noting that he told the RSO and other Embassy personnel that "I was in their park with respect to the Gurkhas, and that I'd do my best to resolve the issue" of their compensation.

36. Ignoring Plaintiffs' concerns, on March 15, 2007, AGNA's Contracts Manager, Michael Shingledecker, purposely presented a deceptive proposal to the Department of State with regard to the number of hours to be worked by expatriates and Gurkhas. The contract

required that expatriates work no more than 54 hours per week and that Gurkhas work no more

than 60 hours per week.  Mr. Shingledecker advised Plaintiffs and others that he wanted

everyone to "keep quiet" about the DoS requirement of no more than sixty (60) hours per week

because AGNA needed to increase the work load to seventy-two (72) hours per week in order to

meet profit and budget goals.

37.  Plaintiffs promptly complained to Defendant Semancik about these deceptive

business practices.  On March 17, 2007, in an e-mail exchange with Plaintiff Sauer, Defendant

Semancik admitted that AGNA had seriously underbid the proposal to provide security for the

U.S. Embassy in Kabul stating that "[y]ou and I were both handed this BD [business

development] bag of shit to deal with – as were Mike O [O'Connell] – Mark [Power] and rest

have some culpability but quite frankly [Jim] Schmitt bullied them into the majority of the

financial decisions**."**  After receiving this email, Mr. Sauer contacted Mr. Semancik by telephone

to discuss the insufficient facilities at Anjuman and other concerns about AGNA's lack of

capacity to support the contract.  Mr. Sauer told Mr. Semancik that it would be preferable to pull

out of the contract than to jeopardize the Embassy security.  Mr. Semancik acknowledged that he

was not sure AGNA could do the project, and expressed frustration and doubt about AGNA

personnel, including Ms. Swaggerty, Mr. Shingledecker, and Mr. Schmitt, all of whom he

described as unsuitable for their roles.

38.  By email dated March 17, 2007, sent to Messrs. Semancik, O'Connell and

Knight, Mr. Sauer described his meeting with the RSO, in which he toured the U.S. Embassy and

Camp Sullivan.  He stated: "We are going to need more people than anticipated.  I'm going to

give you the straight scoop: You need a complete staff to run this thing.  Either commit to

spending the money, or pull the plug on this now before ArmorGroup looks more stupid than a

box of rocks." He emphasized that "there needs to be a clear understanding, acknowledgement, and willingness to correct the financial deficiencies built into this thing by the business development people. You are going to have to go into the margin."

39. By email dated March 18, 2007, Mr. Sauer informed Mr. Knight, Middle East Director for AGI, that there was "no way Anjuman can absorb the administrative burden," and that it was impossible for Camp Anjuman to provide administrative and logistical support for the United States Embassy in Kabul. Mr. Knight responded by email that day stating: "It would appear the US have seriously underbid this!"

40. On or around March 21, 2007, Defendant Ruart and two other AGI managers arrived from London to assess the staffing situation and to begin processing incumbents who sought employment with AGNA. During the course of their visit, Mark Power, AGNA Finance Director, requested that Mr. Sauer continue to move forward with a 72-hour work schedule, and inform Ms. Ruart that this was how the shifts would be organized.

41. On March 22, 2007, in a strongly worded series of emails sent to Defendants' top managers and executives, Mr. Sauer complained about Defendants' plan for salary, rotation, and recruitment for the U.S. Embassy and in particular the salaries to be paid to the Gurkha guard force. He stated: "Here's a couple of pointers for those of you who have never stood in a post in a combat zone: Human beings on a static post become bored after 4 hours. After 8 or 10, they are inattentive. After a couple of months of spending more than 50% of your time in a state of inattentiveness, you become sloppy." Objecting to Defendants' "profit over security" mentality, he stated that he would not permit "[b]usiness development and business process . . . to drive operations on this program."

42.  During the course of Ms. Ruart's trip to Kabul, it became apparent to Mr. Sauer that she intended to try to "low ball" salaries for the expatriate guard force in an effort to pressure employees from the United States to decline these positions.  By email to Mr. Semancik dated March 25, 2007, Mr. Sauer advised that Ms. Ruart had complained that U.S. expatriates "were too expensive for the budget, and that she would replace them all with South Africans who would work for less."  Ms. Ruart also indicated a scheme to pay employees from Jersey.  As Mr. Sauer advised Mr. Semancik, this plan demonstrated a lack of understanding of DoS's intent and requirement that only U.S. citizens serve in leadership positions under the contract (unless an incumbent received a waiver from the RSO, not including the Project Manager and Deputy Project Manager who were to be cleared U.S. citizens with top secret clearances only).  He further advised: "We have another administrative situation I'm not comfortable with.  That's the business of paying our folks out of 'Jersey' . . . Jersey can't issue 1099s.  I may be incorrect, but I believe that AGNA, being an American corporation, is required by law to report all incomes paid to the IRS.  Of course, Caroline was full of glib comments about how [ArmorGroup] has always done this and it was nothing to worry about.  Glib doesn't work with Sauer."

43.  On or about March 27, 2007, Ms. Ruart made a presentation to the incumbent work force about the pay and benefits AGNA intended to provide when it took over security services at the U.S. Embassy.  The information was at odds with the information provided by AGNA's Human Resource personnel, and was contrary to what was required under AGNA's contract with DoS.  Ms. Ruart told Mr. Sauer that she wanted to replace all the Americans with South Africans since Americans were "too expensive."  Subsequent to this conversation, Mr. Sauer warned Messrs. Semancik and O'Connell that Ms. Ruart "will be difficult to deal with" and may run roughshod over AGNA's HR Director, Ms. Swaggerty, who was, by proxy

agreement, the HR decisionmaker under the DoS contract. Mr. Sauer noted that "Caroline and I are like oil and water" and I "made it very clear to her that she could not make up her own rules [about hiring, salaries and overhead] without approval from Karl [Semancik or] me."

44. By email dated March 30, 2007 to Mathew Brabin, Chief Financial Officer of Defendant AGI, and copied to Messrs. Semancik, Knight and O'Connell, Mr. Sauer once again objected to the staffing and proposed rotations for the U.S. Embassy, including salary-cutting decisions made by AGI to ensure a greater margin of profit for AGNA. This was in direct violation of the proxy agreement and direct evidence of AGI's improper involvement in the operational aspect of the U.S. Embassy project itself. After receiving Mr. Sauer's email, Mr. Semancik scolded Mr. Sauer for making direct contact with Mr. Brabin, whom he referred to as "one of the 4 most senior corporate officers" of AGI. He reminded him that "you are in a corporate entity and not the military" and that "the Company must make decisions that are financially sound."

45. By email dated March 31, 2007, to Mr. Semancik and Mr. O'Connell, Mr. Sauer complained that Ms. Ruart was deliberately deceiving applicants about Company benefits with an intention to "bait and switch" the benefits after they came on board. He stated: "This is unsatisfactory. Dishonest at worst and deceptive at best. I will not tolerate this."

46. By email dated April 1, 2007, Mr. O'Connell made clear that despite the formidable problems that AGNA was having complying with the contract, he had little concern that DoS would actually pull the contract from AGNA because the DoS contracting officer was "under severe pressure to make it work." He advised high-level managers and executives from Defendants AGI and AGNA that DoS contracting officers, including Steve Rogers, were "under intense Congressional scrutiny for all procurements coming out of his office" as a result of

Blackwater. Mr. O'Connell noted that "All the folks at State are under a tremendous amount of pressure, scrutiny and stress on this one, including pressure from the American Ambassador in Afghanistan." He further advised that DoS "was tracking our progress on a daily if not hourly basis" and that Mr. Sauer was having similar contact with Embassy personnel. He advised that the Company would have "no problem" managing the security piece of the contract but "that this is going to be a very tough program to manage from a financial management standpoint" and that there would be "a tremendous amount of government oversight and auditing on this program." After receiving this email, Mr. Sauer responded, "Good . . . . Do not let Ruart slip around on this. She must commit to fixing her errors at first chance, and none of this 'bait and switch' crap."

47. Mr. O'Connell subsequently admonished Mr. Sauer not to mention to U.S. Embassy personnel the issue of chaos in the retention of the incumbent Guard Force and especially with the Gurkha contingent, and instead to "put on the AGNA face." In response, Mr. Sauer told him that he would not deceive or mislead the RSO, who is the primary operational leadership for the DoS. Mr. O'Connell directed Mr. Sauer to let him do the talking in meeting with the Embassy.

48. Mr. Sauer also clashed with Defendant O'Connell about AGNA's failure to acquire armored transportation to move the guard force to and from the U.S. Embassy and to service all AGNA owned vehicles as well as the DoS owned Bearcats. The prices provided for the purchase of vehicles to DoS under the contract were unrealistic, and led to efforts by Defendants Semancik, O'Connell and others to downgrade the quality of the vehicles to be purchased, over Mr. Sauer's repeated objections.

49. On or around April 2, 2007, Mr. Sauer clashed with Ms. Ruart about her improper involvement with the U.S. Embassy project. Mr. Sauer reminded her that the U.S. Embassy contract required compliance with a proxy agreement, and that AGNA HR personnel were to make decisions under the contract, not AGI managers. Ms. Ruart responded in an angry manner to these comments, and Mr. Knight, who was present during this altercation, later warned Mr. Sauer that Ms. Ruart was "well-connected" with the AGI Operations Director and got away with bullying due to her relationship with him.

50. On April 3, 2007, Mr. O'Connell and Mr. Martino met with Joe Bopp, the DoS contracting officer, during which Mr. O'Connell painted an overly rosy and distorted picture of AGNA's progress under the contract. By email sent to AGNA management, Mr. O'Connell noted that he had received a "heads up" from the Department of State that the RSO would ask AGNA to provide additional support under the contract "without thinking about budget impacts or funding . . . we must also be diplomatic but push back if the request is out of scope or WE WILL NOT GET PAID. " He also noted under the "Heads up from State" part of his email that "we will be sharing a common area with Blackwater and the RSO and his team. There is currently NO INVENTORY CONTROL on Weapons or Ammo. Optics are missing from some M24s, and no one has an accurate count fo (sic) ammo, who used what, when, etc."

51. On April 9, 2007, Messrs. Sauer, Gorman, and O'Connell met to discuss what information AGNA would present to the RSO at their planned meeting. Mr. O'Connell directed Mr. Sauer to "keep quiet about the possibility of a massive Gurkha walkout," or the projected lowering of expatriate salaries, and the other issues which AGNA wanted to keep from the RSO. In response, Mr. Sauer told Mr. O'Connell that AGNA had a duty to keep the RSO accurately informed of the situation. Mr. O'Connell responded that it was Mr. Sauer's duty to "put on the

AGNA face," to which Mr. Sauer responded that he had only one face and it was not going to be used to deceive the RSO.

52.  On or around April 15, 2007, Mr. Martino arrived at Kabul.  Immediately upon his arrival, he developed concerns about the false claims made by AGNA to DoS concerning the viability of Camp Anjuman to provide support for the U.S. Embassy Security Force and to otherwise perform under the contract.

53.  On April 30, 2007, Mr. O'Connell met with Mr. Sauer, who was home on leave in Boston, Massachusetts, to discuss his job performance.  Mr. O'Connell told him that he needed to do a better job getting along with AGI personnel, and that specifically, London was extremely upset over his protests concerning Ms. Ruart's actions.  He stated that AGNA considered him to be an "outstanding project manager" but a "pain in the ass."  Mr. Sauer complained that Mr. Semancik and Mr. O'Connell expected him to blow smoke at DoS by "parroting the AGNA line" though they all knew that there were gross exaggerations and outright fabrications in AGNA's  proposal and other documents to DoS.

54.  In thousands of emails similar to the ones detailed above sent to Defendants' managers and executives from the end of March 2007 continuing through the time of their terminations, Plaintiffs expressed concerns about the false claims made by AGNA to the DoS as to the viability of Camp Anjuman to provide support for the U.S. Embassy Security Force. Specifically, Plaintiffs informed Defendants and U.S. Embassy officials that AGNA and/or AGI falsely represented, both directly and indirectly, that Anjuman Base was a full service training facility and that AGNA would provide:

(a)  **Full training facilities, suggesting a firing range**, when in fact no such range existed at Anjuman.  AGNA's deception to DoS made its contract bid more attractive

because a firing range at Camp Anjuman would eliminate the requirement to use ISAF/NATO ranges – a 40-minute drive from Camp Sullivan and Anjuman, which would present the risk of attack on the road;

(b) **Mechanic facilities to service a fleet of seven armored transport vehicles, armored SUVs, and various smaller vehicles used at the Embassy**, when in fact Anjuman had a small garage area – not much bigger than a two-car domestic garage – that could not handle the "Bearcat" vehicles or the transports required to get the security force to and from the Embassy;

(c) **Administrative and Logistics Support**, when in fact Anjuman Base was overburdened and could barely sustain itself;

(d) **Catastrophic Recovery Capabilities**, when in fact the resources at Anjuman Base were insufficient to provide immediate replacement of personnel or significant support in the event of an attack;

(e) **A headquarters staff with 25-years of experience in government contract security, and four years of experience in Afghanistan**, when in fact AGNA had no experience in Afghanistan, and no one on the AGNA headquarters staff had any military, police, or private security operational experience.  It appears that AGNA's claims to DoS were based upon the experience of Defendant AGI, the London-based parent company, which was barred by the proxy agreement from having any operational involvement with the U.S. Embassy project;

(f) **Force protection plans, secure transportation and established special relationships with the Afghan government**, when in fact it had no established special relationships with Afghan government authorities, the International Security Assistance Force (ISAF), or other military entities;

(g) **Local and national expertise, including two Afghan screeners with the requisite experience and fluency in English, Pashtu, Dari and Urdu,** when in fact AGNA provided no screeners with the claimed experience and skills;

(h) **Gurkha retention of 87 percent**, when in fact, when AGI cut Gurkha salaries by 50 percent, nearly all of the Gurkha force at the British Embassy walked off the job in late 2006, and staged a second complete walkout in May of 2007;

(i) **Comprehensive recruiting and vetting of new personnel for the U.S. Embassy**, when in fact AGNA failed to contact references or previous employers of prospective personnel, and hired individuals without DD214 forms, drivers' licenses, or passports and who otherwise should have been dropped from training for various acts of intimidation and perversity;

(j) **Kenneling facilities for Explosive Detection Dogs (EDD)** when in fact no kennel existed during the Plaintiffs' tenure. Without proper kenneling facilities prior to assuming control of Embassy security, it was impossible to acclimate the dogs to the environment. According to K-9 experts, a non-acclimated dog is at less than 50 percent effectiveness until acclimated – a period that takes about two weeks minimum;

(k) **Close liaison with the local police and other Afghan authorities**, when in fact there was no special coordination with Afghan authorities;

(l) **Close liaison and communication with U.S., NATO, and coalition troops/force protection units**, when in fact there was no compatible communications equipment that would facilitate such communications;

(m) **Performance of preliminary route sweeps and active surveillance detection prior to road moves**, when in fact AGNA was not equipped with the necessary staff or equipment to perform this activity;

(n) **Variable ESF shift change times to defeat timed attacks**, when in fact the shift structure and road conditions made compliance with this representation impossible, leaving AGNA guards vulnerable to attack during transport from Camp Sullivan (Guard Force camp) to the U.S. Embassy;

(o) **Acquisition in a timely fashion of the necessary guard staff**, when in fact it never did so. Contrary to the specific requirements under the contract, AGNA failed to properly screen and hire marksmen, medics, and other personnel required under the contract;

(p) C**ompetence with the International Traffic in Arms Regulations (ITAR),** when it fact, there was complete chaos in the movement of arms and ammunition from Iraq to Kabul. For example, by email dated April 2, 2007, Bill Shaw, ArmorGroup Iraq, noted that ArmorGroup "has been unable to locally obtain any further information on transportation of wpns out of Iraq. … and the subject articles cannot leave the possession of ArmorGroup nor Iraq;" and

(q) **Access to a source to purchase fuel**, when in fact, AGNA lacked the capability to service and/or fuel the multitude of vehicles associated with the project as required under the contract with DoS.

55. Despite the serious nature of the concerns identified by Plaintiffs above, Defendants failed to take corrective action, leading Plaintiffs to inform both Defendants O'Connell and Semancik on repeated occasions in May 2007 continuing up to the time of their terminations, that AGNA was jeopardizing the security of the U.S. Embassy as a result of

AGNA's deceptions, underfunding, and consequent understaffing of the project.   Mr. Sauer complained that given the way Defendants were treating incumbent and newly hired employees, he expected unreasonable attrition and constant turnover of personnel "in an environment where consistency is a matter of life and death."   Mr. Sauer further advised Defendants O'Connell and Semancik that AGNA "needed to either fund the project correctly or pull out, given that the operational chaos could lead to a loss of life."

56.   By late May 2007, Plaintiffs became increasingly frustrated and concerned by Defendants' failure to take appropriate remedial action, including with respect to the hiring of qualified designated marksmen and retention of the Gurkhas.   During late May 2007, the entire Gurka force at the FCO walked off the job because of low wages and the poor treatment that they were receiving from AGI.   AGI hired displaced Nepalese in Kabul to fill their ranks.   Fearing an uprising and violence at Camp Anjuman, Alex Brown, the AGI Country Manager, asked that all western personnel remain in their rooms and be armed in the event of violence.   Defendant Ruart's response to this crisis was even more alarming; she told Mr. Sauer that they should "lock [the Gurkhas] in their rooms until they agree to work for less."

57.   By email dated May 17, 2007, Mr. Sauer once again raised the alarm to Messrs. Semancik and O'Connell about AGNA's failure to hire qualified marksman, noting: "If we have the situation with a mob (and they've had them) and the necessity to take out the guy with the RPG at 2 or 300 yards – the guy being surrounded by women and kids – you don't want a medic or some wannabe sniper with three weeks of DDM training on the scope."   Mr. Sauer urged Defendants O'Connell and Semancik "to tell DoS now that we are having problems with recruiting and retaining qualified DDMs, and it may take us additional time to staff the whole job category."   Mr. Sauer's entreaties were ignored by AGNA officials.

58.   During the period May 25 through May 28, 2007, Mr. Semancik visited Kabul. During his visit and review of ArmorGroup's preparations to take over the security of the U.S. Embassy, Mr. Sauer informed him of the many issues that were cause for deep concern about the ability of AGNA to competently and timely secure the U.S. Embassy.  Mr. Sauer informed Mr. Semancik that he would continue to fight the good fight, but would not, under any circumstances, deceive the Department of State, the RSO, or the workforce for the sake of AGNA/AGI's image.  Mr. Sauer further emphasized to that he "had an obligation to the Embassy and the U.S. taxpayers to ensure the safety of the Embassy, the embassy staff, and the workforce, and that if that was going to be compromised, [he'd] have no choice but to disclose these problems to the RSO and DoS."  Mr. Semancik was visibly angered by these comments and by Mr. Sauer's insistence that these issues be disclosed to DoS and/or Embassy officials.

59.   By email dated May 28, 2007, Mr. Semancik thanked Mr. Sauer for his "perseverance" and stated "[t]his is a tough job but you and the team are the right guys." Comments like this did not placate Plaintiffs who continued to lodge their frustrations and objections to the manner in which AGNA was operating under its contract with DoS.

60.   Plaintiffs also objected, including by emails dated May 31, 2007 and June 1, 2007, to high-level AGNA and AGI managers that AGNA had failed to ensure that personnel were given a "Moderate Risk Public Trust" clearance level before being hired.  As a result, AGNA deployed dozens of employees who were not permitted to enter Camp Sullivan, much less work at the U.S. Embassy.  Mr. Sauer informed Mr. Semancik that "there's one more thing that may be slipping the corporate mind:  The U.S. Embassy Kabul is a national security issue even more than a business issue.  The security CAN NOT be screwed up."  Sounding the alarm further, he noted that "[a]dministrative nitwittery can screw up operations, but the corporate

26

excuses ring hollow when the 'Monday Morning Quarterbacks' start asking why people are dead."

61.  By email dated June 1, 2007, Mr. Martino informed Ms. Swaggerty and Mr. O'Connell that a person to whom a job offer had been made presented a hiring risk he did not want to incur.  In response, Ms. Swaggerty stated: "We shouldn't have issued him a contract then. . . .  Best thing to do now is let him go home thinking he has a job, then about 1-2 weeks after we actually take over, breach the contract by telling him we received a violation/disciplinary report on him. . . .  Not legal, and certainly not the right way to do it, but it will be the only way to do it that may skate us past the UK employment lawyers."  Mr. Sauer immediately shot back an email to Ms. Swaggerty and Mr. O'Connell stating emphatically:  "We shall do nothing illegal or deceptive regarding this contract."  Also on June 1, 2007, Mr. Semancik directed plaintiffs to delete emails demonstrating AGNA's plan to fire Mr. Shingledecker.

62.  By email to Defendant Semancik and copied to Defendant O'Connell dated June 1, 2007, Mr. Martino provided them with an "honest assessment" of the situation.  He noted that "[e]very issue here is tied to money . . . I understand corporate finances and administrative requirements, as well as the need to constantly 'watch the bottom line'.  I can empathize to some degree with what the folks in McLean are battling with, but I honestly believe that many of them have no clue as to what our daily fight looks like…. I want to make this work and am committed 110% to doing the right thing, but at the end of the day, the right thing is protecting the embassy."

63.  By email dated June 2, 2007, Mr. Sauer further sounded the alarm, informing Defendant Semancik that "we BOTH have to start getting our arms and minds wrapped around

27

the actual security piece of this project. I don't have time to listen to a bunch of drivel on business process. That's not to say that I am ignoring 'The Commercial Realities' – but we do have an embassy to secure." Mr. Sauer once again complained that AGNA management had "zero security experience" and that it "is a serious problem in their ability to comprehend the concept of operations from a security perspective. There is not even ONE of them who is qualified to work as a guard on this project." Later that day, he sent Mr. Semancik a "Risk Register," which painted an extremely negative picture of AGNA's progress under the contract and made clear that the situation could only be mitigated by the infusion of significant funds. Mr. Semancik responded negatively by email, indicating that he was not interested in the information.

64.    By email dated June 2, 2007, to Defendant Semancik, which was copied to Defendant O'Connell, Mr. Martino raised a number of serious concerns about AGNA's capabilities, corporate culture, hiring practices, and security dogs. He ended the email stating: "Corporate profit aside, my understanding of the 'intent' of this project, which should be our guiding moral compass on all decisions, is to protect the U.S. Embassy and the men and women who work there. I am no longer convinced that that is everyone's number 1 priority." Echoing those concerns, Mr. Sauer informed Defendants Semancik and O'Connell that he would need to go to the RSO at the U.S. Embassy to advise him that AGNA cannot house security dogs at Camp Sullivan, and that "this impacts on the security of the embassy." Defendants ignored his concerns.

65.    After not receiving a satisfactory response from AGNA officials, Mr. Martino sent another email to Defendants O'Connell and Semancik on June 2, 2007, objecting to the Company's operations and the inexperience of the AGNA support staff. He stated: "It is obvious

to a novice that this team has no tactical or operational experience and has no business making decisions that significantly impact a project of this scope and magnitude.  Lives are in the balance in addition to dollars."  He urged them to hire staff that either had the requisite background in the theater of operations "or who are at least willing to come here and stay long enough in order to gain the proper perspective that will enable them to make support decisions that take into account operational risk and not just corporate financial risk."  Despite the urgency of the requests made for AGNA to come into compliance with the DoS contract and the concerns expressed by Plaintiffs, Defendants continued to ignore their warnings and grew increasingly hostile to Plaintiffs for raising them.

66.  On June 2, 2007, Mr. Sauer contacted Mr. Pietrowicz to provide information requested by the Embassy about incoming personnel.  Mr. Sauer advised Mr. Pietrowicz that there were personnel problems, K9 problems, and logistics issues that needed to be worked out. He further reported that AGNA was encountering serious problems recruiting designated marksmen and medics.

67.  By email dated June 3, 2007, Mr. Semancik informed Mr. Sauer that he intended to contact high level ArmorGroup personnel, including AGI's CEO, to express "high concern about the lack of support from Anjuman."  He was trying the deflect blame onto personnel in Anjuman who had nothing to do with the bidding for the contract.

68.  On June 4, 2007, Mr. Martino sent Mr. Semancik a lengthy email reiterating some of the more serious problems with AGNA's implementation of the contract.  Mr. Semancik responded that the problems that Mr. Martino had identified could not be resolved overnight.  He noted that O'Connell would be traveling to Kabul to prioritize what needs to be done  and that he

would force folks in McLean to do there (sic) jobs." He ended stating "I am tired of this debate and we need to move on."

69. On or about June 8, 2007, Defendant O'Connell arrived at Camp Anjuman, but refused to meet with Plaintiffs or to discuss the serious and endemic problems with Defendants' security services to the U.S. Embassy.

70. Increasingly frustrated by Defendant O'Connell's refusal to meet with them, Mr. Martino sent him an email on June 9, 2007, which he copied to Defendant Semancik. He noted that AGNA was at a critical juncture and that the Company needed to "conduct a full court press and mobilize all resources, even those outside of the contract, toward resolving issues" regarding the shift rotation, recruitment and vetting of personnel, and attrition. He noted that these issues were "monumental hurdles" to overcome which were not supportable by the resources indicated in the budget. He concluded that "ArmorGroup needs to take a hard look at this contract and make a decision to either INVEST in these items in order to reap the potential future rewards and side benefits of successfully executing this contract or face reality that we are not properly funded or set up for success." Defendants failed to respond to this email.

71. On or around June 12, 2007, Plaintiffs participated in a meeting of the incoming AGNA leadership team that was convened to answer general questions. In response to a question about the firing range, Mr. O'Connell responded that AGNA was going to "fly in a portable range." He then explained that the portable range would cost "a couple of hundred thousand dollars – chump change" – a statement that was offensive to AGNA's workforce and went over poorly with the Gurkha leadership who had just had their salaries slashed.

72. Following the meeting referenced in paragraph 70, above, Plaintiffs attempted to explain to Mr. O'Connell why his comments had been insensitive and inadvisable given the

"touch and go" situation with the Gurkhas. They, along with Mr. Gorman, advised him that the Company (and he) needed to understand how the staffing plan coupled with the shift and leave rotation schedule were "unrealistic and not in keeping with the requirements of the RFP." Mr. O'Connell, who is physically a much larger man than Mr. Sauer, approached him in an aggressive and menacing manner. At this point, Mr. Gorman intervened and asked Mr. O'Connell whether he had ever stood a 12-hour post six days a week. Mr. O'Connell, who had no military, law enforcement, or private security experience, glared at Mr. Gorman and barked that there were some things going on that they did not know about. At this point, Mr. Sauer asked about reports of aberrant and assaultive behavior being exhibited by personnel at AGNA's training facility in Texas during pre-deployment training. Mr. O'Connell responded that he (Sauer) did not need to worry about it, to which Mr. Sauer replied that he was sure that the RSO would be concerned to learn that AGNA was aware of the situation and had failed to act. Mr. Sauer further highlighted the dangers of allowing mentally unbalanced personnel to come to Kabul and be armed, and insisted that he had an obligation to inform the RSO of this situation.

73.   After the conversation referenced in paragraph 71, above, became more heated, Plaintiff Martino asked them to move the conversation inside to a classroom, where they would not be overheard by AGNA personnel and other third parties. When inside, Mr. O'Connell became more confrontational and cursed at Mr. Sauer. Plaintiff Martino attempted to calm the situation down, reiterating that Plaintiffs were the in-country leadership and needed to know what was happening at the corporate level "since all we could see was chaos." In an angry and agitated manner, Mr. O'Connell stated that ArmorGroup was a publically held corporation, and that their "ultimate responsibility" was to the investors.

74.   Because AGNA officials, including Mr. O'Connell, had refused to address any of the concerns Plaintiffs expressed about the safety of the U.S. Embassy or the guard force – emphasizing instead concerns about corporate profit – Plaintiffs concluded that they had both a legal and moral duty to report Defendants' fraudulent misstatements to the United States government concerning AGNA's capacities and qualifications to take over security of the U.S. Embassy.

75.   Accordingly, on the evening of June 12, 2007, Plaintiffs and Mr. Gorman went to the U.S. Embassy and reported their concerns verbally and in writing to the Assistant RSO Pietrowicz, including those concerns described in the preceding paragraphs.  Mr. Pietrowicz advised that given the seriousness of the concerns being raised, he would have to report the information to the RSO and submit a report to DoS in Washington, D.C.  He further indicated that the information they had provided would negatively impact on a separate $500 million proposal Defendants had submitted to provide security services in Iraq.  Finally, Mr. Pietrowicz advised them that Defendants would be informed "at once" about the serious concerns Plaintiffs had raised.

76.   Due to the significance of the issues raised by the Plaintiffs and Mr. Gorman, Mr. Pietrowicz informed them that he was concerned for their safety and asked if they wanted to stay at the U.S. Embassy that evening.  Plaintiffs declined.

77.   At the time of the meeting referenced in paragraph 74 above, AGNA was scheduled to assume the security services for the U.S. Embassy in Kabul in less than three weeks.  The contract for these services was worth approximately $187 million.  AGNA was also in the final bidding process for a $500 million contract to provide security for reconstruction efforts in Iraq.

78.  In the early morning of June 13, 2007, Defendant O'Connell awakened Plaintiffs and told them that they were being terminated.  He presented them with airline tickets for a flight that left Kabul, Afghanistan in approximately one hour.  Defendant O'Connell's sudden and unexpected notice did not leave sufficient time for the Plaintiffs to get to the airport, which led them to refuse to leave at that time.

79.  AGNA then confined Plaintiffs against their will to the compound and attempted to confiscate their U.S. Embassy passes, which Plaintiffs refused to surrender.  However, AGNA stripped Plaintiffs of their weapons, cell phones, computers, and vehicles, making it impossible for them to leave their quarters or to communicate with the RSO or other Embassy or government officials.  Alex Brown, the AGI Country Manager, who was Plaintiffs' main point of contact during their confinement, was instructed by Defendant Semancik to confiscate Plaintiffs' equipment and not to let them contact the U.S. Embassy or leave the compound.

80.  During their confinement, which lasted approximately 24 hours, Plaintiffs were also asked by AGNA to sign documents that would waive or limit AGNA's liability.  The documents specified that all claims against AGNA would be waived and that Plaintiffs would agree not to contact AGNA employees or customers (e.g., the U.S. government).  Plaintiffs refused to sign the waiver.

81.  On June 14, 2008, Plaintiffs, along with Mr. Gorman, left Kabul to return to the United States.  As they departed Afghanistan, Plaintiffs were aware of and had reported many deficiencies in the Defendants' plans to assume control of the security of the U.S. Embassy in Kabul.

82.  Upon information and belief, following Plaintiffs' terminations, AGNA was cited and fined by DoS for violations of contract and security standards.  Many of the issues faced by

AGNA and later cited by DoS were issues raised by the Plaintiffs, including AGNA's failure to employ the requisite number of medics, physician assistants and other medical staff, and its failure to employ the requisite number of designated marksmen.

82. Defendant O'Connell's action in terminating Plaintiffs was directed, ratified, and/or approved by Defendant Semancik and other AGNA and/or AGI officials located in the United Kingdom and the United States. Upon information and belief, Defendants AGI and Ruart were involved in, ratified, initiated, or approved the decision and actions taken to terminate Plaintiffs. Following Plaintiffs' terminations, AGNA replaced Mr. Sauer as Project Manager with a former South African Army officer who does not meet the specifications of the DoS contract requiring that the Project Manager be a U.S. citizen with a top secret security clearance.

83. In September 2007, Mr. Sauer applied for unemployment compensation in Virginia. During a conference call with the Virginia unemployment office, Joe Colon, the Human Resources representative for AGNA, stated that there was "no reason that AGNA would resist" Mr. Sauer's application for unemployment compensation. Following the Company's receipt of a letter from Plaintiffs' counsel putting them on notice about Plaintiffs' legal claims against the Company, AGNA further retaliated against Plaintiff Sauer by appealing the determination by the Virginia Employment Commission awarding Mr. Sauer benefits and by falsely telling the Commission that he was fired for "misconduct."

84. As a direct and proximate result of the AGNA's termination of their employment, Plaintiffs have been "blackballed" in the private security industry. Each time Plaintiffs have applied for positions, they have been forced to answer "yes" to the question that he has been terminated from a position. Mr. Sauer must also answer that there has been a

determination that he was fired for cause.   Plaintiffs have been unable to find comparable

employment since their termination by AGNA, despite their diligent efforts to do so.

**COUNT I:**    **Violation of False Claims Act, Employee Protection Provision,**
**31 U.S.C. § 3730(h), Against All Defendants**

85.   Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 84,

above.

86.   Plaintiffs Sauer and Martino were employed by Defendant AGNA in early 2007

as Program Manager and Deputy Program Manager, respectively, responsible for overseeing

development and operation of a program to ensure protection of the U.S. Embassy in Kabul,

Afghanistan.  Plaintiffs learned through investigation that Defendants fraudulently induced the

United States Department of State to engage AGNA to provide these services through false

statements regarding Defendants' experience and capabilities to carry out such a program which

Defendants knew to be false and on which DoS relied.  Plaintiffs reported their findings to

responsible officials of the Defendants and to responsible security personnel at the U.S. Embassy

for investigation.  In retaliation for Plaintiffs' investigations and reports regarding Defendants'

fraud against the United States, Defendants terminated their employment, effective June 13,

2007.

87.   Defendants' actions in terminating Plaintiffs' employment and their treatment of

Plaintiffs incident to discharging them violated 31 U.S.C. § 3730(h), which prohibits retaliation

by employers against employees who investigate and/or report false statements within the

meaning of 31 U.S.C. § 3729.  31 U.S.C. § 3729 holds liable any person who, *inter alia*,

"knowingly makes, uses, or causes to be made or used, a false . . . statement to get a false or

fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2).  Each claim for

payment pursuant to a contract induced by false statements is itself false and fraudulent within

the meaning of this provision. Plaintiffs' actions in investigating and reporting Defendants' fraud in securing their contract with DoS could reasonably have led to a viable False Claims Act suit pursuant to 31 U.S.C. § 3729.

88. Plaintiffs have exhausted their administrative remedies through their disclosure to the RSO.

89. As a direct and proximate result of the foregoing, Plaintiffs have lost the benefits and privileges of employment, and have suffered additional economic and non-economic damages including severe emotional anguish and irreparable, continuing harm to their careers. Plaintiffs are entitled to all relief necessary to make them whole.

**COUNT II:    Wrongful Discharge in Violation of Public Policy,
Against All Defendants**

90. Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 89, above.

91. Defendants wrongfully terminated Plaintiffs Sauer and Martino in violation of the public policy mandate set forth in 18 U.S.C. § 1001, which prohibits the submission of false information to the government, and in 18 U.S.C. § 1513(e), which prohibits any person or corporation from knowingly retaliating against a whistleblower who has provided to a federal law enforcement officer any truthful information relating to the commission or possible commission of any federal offense.

92. Defendants were aware that Plaintiffs disclosed to the DoS and the U.S. Embassy the fraudulent representations made by Defendants to the DoS regarding AGNA's experience, staffing capabilities, equipment and facilities in support of AGNA's effort to secure and maintain a $187 million government contract to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan.

93.  Defendants terminated Plaintiffs because they reported to the DoS and the U.S. Embassy the fraudulent representations made by Defendants to the DoS regarding AGNA's experience, staffing capabilities, equipment and facilities in support of its effort to secure and maintain a $187 million government contract to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan.

94.  Defendants' termination of Plaintiffs violates the public policy mandates set forth in 18 U.S.C. § 1001 and § 1513(e).

95.  There is no private right of action under either 18 U.S.C. § 1001 or § 1513(e).

96.  As a result of the wrongful and retaliatory discharge by Defendants, Plaintiffs have suffered damages including, but not limited to, lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish, and stress.

**COUNT III:  Fraudulent Misrepresentation, Against Defendants
AGNA, AGI, Semancik, and O'Connell**

97.  Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 96 above.

98.  Defendants AGNA, AGI, Semancik, and O'Connell made false and fraudulent representations to Plaintiffs regarding AGNA's experience, staffing capabilities, equipment and facilities to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan.

99.  The false and fraudulent representations made by Defendants regarding the Company's experience, capabilities, equipment, personnel and facilities to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan were material, in that they went directly to the effectiveness and viability of the very mission for which Plaintiffs were hired, and on which they staked their reputations and professional futures.

100.  Defendants were aware that their representations to Plaintiffs regarding the Company's experience, capabilities, equipment, personnel and facilities to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan were false at the time they made them, and Defendants intended to deceive Plaintiffs with these false representations.

101.  Plaintiffs acted in reliance on Defendants' false representations regarding the Company's experience, capabilities, equipment, personnel and facilities to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan, by quitting their jobs, accepting a job with AGNA, and going to Afghanistan.

102.  Defendants' intentional and deliberate actions in making material false representations to Plaintiffs on which they relied to their detriment were malicious, willful, wanton and in conscious disregard of Plaintiffs' common law rights.

103.  The actions taken by Plaintiffs in reliance on Defendants' false representations regarding the Company's experience, capabilities, equipment, personnel and facilities to provide a guard force to protect the U.S. Embassy in Kabul, Afghanistan resulted in provable damages or harm to Plaintiffs, including but not limited to lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish, and stress.

**COUNT IV:   False Imprisonment, Against Defendants
AGNA, AGI, Semancik and O'Connell**

104.  Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 103 above.

105.  On June 13, 2007, Defendants confined the Plaintiffs, against their will to the AGNA compound, for approximately 24 hours, thereby intentionally restricting their freedom of movement without legal right.  Defendants stripped the Plaintiffs of their weapons, cell phones, computers, and vehicles, making it impossible for them to communicate with the RSO or other

Embassy or government officials.  AGNA's actions made it impossible for the Plaintiffs to leave the facility.

106.  Defendants intentionally used force, words or acts restricting Plaintiffs' freedom of movement and their ability to leave, which Plaintiffs were afraid to ignore and/or reasonably believed they must submit.

107.  Defendants' actions constitute the tort of false imprisonment in violation of the common law.

108.  Defendants' intentional and deliberate action in confining Plaintiffs against their will was malicious, willful, wanton, and in conscious disregard of Plaintiffs' common law rights.

109.  As a direct and proximate result of their false imprisonment, Plaintiffs suffered significant emotional distress, anxiety, fear, and humiliation.

**COUNT V:**   **Defamation, Against Defendant AGNA**

110.  Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 109 above.

111.  Defendant AGNA made false statements about Plaintiffs by taking the position that they were terminated for cause or for misconduct, when in fact Plaintiffs engaged in no such misconduct or any other action that would provide just cause for termination.  Defendant stated to third parties, namely the Virginia Employment Commission, that Plaintiff Sauer was terminated for misconduct.

112.  Plaintiffs were and continue to be compelled to publish the false and defamatory statements to prospective employers, on job applications, and on government security clearance forms when asked why they left their former employment.

113.  It was reasonably foreseeable to Defendant AGNA that Plaintiffs, in seeking new employment, would inevitably be asked why they left their former employment with AGNA and therefore be compelled to reiterate the false and defamatory statements – i.e., that they were fired for cause or for misconduct.

114.  The compelled self-publication of the defamatory statements has resulted directly in substantial economic losses to Plaintiffs, as well as damage to their professional reputations, and has caused them extreme anxiety, emotional distress, and humiliation.

115.  Defendant's actions constitute the tort of defamation by compelled self-publication.

116.  Defendant's intentional and deliberate action in defaming Plaintiffs through compelled self-publication was malicious, willful, wanton, and in conscious disregard of Plaintiffs' common law rights.

### COUNT VI:  <u>Civil Conspiracy, Against All Defendants</u>

117.  Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 116, above.

118.  Defendants AGNA, AGI, Semancik, O'Connell, and Ruart agreed and conspired with one another to terminate Plaintiffs' employment with AGNA, in violation of the public policy mandates set forth in 18 U.S.C. § 1001 and 18 U.S.C. § 1513(e), because of Plaintiffs' refusal to defraud the U.S. government and insistence on complying with the contract and providing adequate safety to the U.S. Embassy in Kabul.

119.  Defendants AGNA, AGI, Semancik and O'Connell agreed and conspired to make fraudulent misrepresentations to Plaintiffs regarding experience, capabilities, personnel

and facilities, which Plaintiffs relied upon in accepting positions with AGNA, in furtherance of their common scheme to defraud the U.S. government.

120. Defendants AGNA, AGI, Semancik, O'Connell, and Ruart conspired to falsely imprison Plaintiffs until their departure from Afghanistan in a common effort to prevent further communications between Plaintiffs and the DoS and others regarding Defendants' unlawful actions.

121. Defendants AGNA, AGI, Semancik, O'Connell, and Ruart agreed and conspired with one another to defame Plaintiffs by characterizing their discharge as "misconduct," when Plaintiffs engaged in no such misconduct, thereby compelling Plaintiffs to self-publicize Defendants' defamatory remarks to prospective employers.

122. Through their conspiracies as described above, and through overt acts they committed in furtherance of those conspiracies, Defendants directly and proximately caused Plaintiffs to suffer loss of income and other economic benefits, jobs search costs and the loss of future employment opportunities, diminished professional status, diminished job opportunities, mental anguish, and emotional distress.

### Prayer for Relief

WHEREFORE, Plaintiffs pray for relief, as follows:

1. Enter a judgment in Plaintiffs' favor and against Defendants under the Employee Protection Provision of the False Claims Act, 31 U.S.C. § 3730(h);

2. Enter a judgment in Plaintiffs' favor and against Defendants for wrongful discharge in violation of public policy based on Defendants' termination of Plaintiffs in retaliation for providing truthful information to the Department of State and the U.S. Embassy in Kabul,

Afghanistan relating to AGNA's fraudulent representations to the U.S. Government, in an amount equal to their actual economic damages doubled, plus interest, costs and attorneys' fees;

3. Enter a judgment in Plaintiffs' favor and against Defendants for fraudulent misrepresentation based on Defendants material misrepresentations to Plaintiffs regarding AGNA's experience and capabilities, on which Plaintiffs' reasonably relied to their detriment, in an amount to be determined at trial;

4. Enter a judgment in Plaintiffs' favor and against Defendants for false imprisonment based on Defendants' confinement of Plaintiffs against their will to the AGNA compound and intentionally restricting their freedom of movement, in an amount to be determined at trial;

5. Enter a judgment in Plaintiffs' favor and against Defendants for defamation based on the foreseeable result that Plaintiffs would be compelled into self-publication on employment applications and security clearance forms of false statements regarding the reasons for their termination from AGNA, in an amount to be determined at trial;

6. Enter a judgment in Plaintiffs' favor and against Defendants for tortious interference with employment contract based on Defendants' participation in Plaintiffs' termination and breach of their employment contracts, in an amount to be determined at trial;

7. Enter a judgment in Plaintiffs' favor and against Defendants for conspiracy to commit unlawful acts of wrongful discharge, fraudulent misrepresentation, false imprisonment, and defamation, in perpetration of a common scheme, in an amount to be determined at trial;

8. An award to Plaintiffs of compensatory damages in an amount to be proven at trial, but in any event not less than $3,000,000 each;

9. An award to Plaintiffs of punitive damages in an amount to be proven at trial, but in any event not less than $30,000,000 each:

42

10.  An award of all reasonable attorneys' fees and costs; and

11.  All other relief the Court deems just and proper.


Debra S. Katz, Bar No. # 411861
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W.
Sixth Floor
Washington, D.C. 20009
Tel. 202.299.1140 /Fax 202.299.1148


Lisa J. Banks, Bar No. # 470948
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W.
Sixth Floor
Washington, D.C. 20009
Tel. 202.299.1140 /Fax 202.299.1148


Richard E. Condit, Bar No. # 417786
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, D.C. 20006
Tel. 202.408.0034 /Fax 202.408.9855


Karen Gray, Bar No. # 488760
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, D.C. 20006
Tel. 202.408.0034 /Fax 202.408.9855

43

Attorneys for Plaintiffs James Sauer and Peter Martino

DATED:  April 24, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES SAUER                                    )
90 Long Duck Pond Road                         )
Plymouth, Massachusetts 02360,                 )
                                               )
PETER MARTINO                                  )
67 Oak Ridge Drive                             )
Epsom, New Hampshire 03234,                    )
                                               )
                    Plaintiffs,                )
                                               )
        v.                                     )
                                               )        08 0698
ARMORGROUP NORTH AMERICA, INC.                 )
1420 Spring Hill Road                          )
McLean, Virginia 22102,                        )   Civil Action No. _____
                                               )
        Serve:                                 )
        CORPORATION SERVICE COMPANY            )
        11 S 12th Street                        )
        Richmond, VA 23218                     )
                                               )
and                                            )
                                               )
ARMORGROUP INT'L, PLC                          )
Egginton House                                 )
25 – 28 Buckingham Gate                        )
London, United Kingdom                         )
SW1E 6LD,                                      )
                                               )
        Serve:                                 )
        CORPORATION SERVICE COMPANY            )
        2711 Centerville Road                  )
        Suite 400                              )
        Wilmington, DE 19808                   )
                                               )
and                                            )
                                               )
KARL SEMANCIK                                  )
1117 Grand Rapids Drive                        )
Herndon, Virginia 20170,                       )
                                               )
and                                            )

MICHAEL O'CONNELL )
1420 Spring Hill Road )
McLean, Virginia 22102, )
)
and )
)
CAROL RUART )
Egginton House )
25 – 28 Buckingham Gate )
London, United Kingdom )
SW1E 6LD, )
)
        Defendants. )
)

## JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

        Respectfully submitted,


_____
Debra S. Katz, Bar No. 411861
Lisa J. Banks, Bar No. 470948
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W.
Sixth Floor
Washington, D.C. 20009
Tel. 202.299.1140 /Fax 202.299.1148


_____
Richard E. Condit, Bar No. # 417786
Karen Gray, Bar No. #488760
Government Accountability Project
1612 K Street, NW
Suite 1100
Washington, D.C. 20006
Tel. 202.408.0034/Fax: 202.408.9855

E
08-698
RCL

JS-44
(Rev. 2/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

James Sauer
Peter Martino

**DEFENDANTS**

ArmorGroup, North America (AGNA); ArmorGroup, Int. (AGI); Karl Semancik; Michael O'Connell; Carol Ruart

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Plymouth, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

88888

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Debra S. Katz, Esquire
Lisa J. Banks, Esquire
Katz, Marshall & Banks
1718 Connecticut Avenue, NW
Suite 600
Washington, DC 20009
(202) 299-1140

Case: 1:08-cv-00698
Assigned To : Lamberth, Royce C.
Assign. Date : 4/24/2008
Description: General Civil

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**◉ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

5

vb

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
31 U.S.C. § 3730(h)--retaliatory and wrongful discharge under the anti-retaliation provision of the False Claims Act

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  **DEMAND $** 66,000,000  Check YES only if demanded in complaint  **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE April 24, 2008  SIGNATURE OF ATTORNEY OF RECORD *Debra S Katz*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.